# EXHIBIT C

Lisa M. Martens (#195824/martens@fr.com)
Andrew M. Abrams (#229698/abrams@fr.com)
FISH & RICHARDSON, P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: (858) 678-4735
Facsimile: (858) 678-5099

Attorneys for Plaintiffs
BUZZTIME ENTERTAINMENT, INC. and NTN BUZZTIME, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUZZTIME ENTERTAINMENT, INC. and NTN BUZZTIME, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SONY COMPUTER ENTERTAINMENT EUROPE, LTD. and SONY COMPUTER ENTERTAINMENT AMERICA, INC., <br><br> Defendants. | Case No. 08 CV 0122 W LSP <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO SONY COMPUTER ENTERTAINMENT EUROPE, LTD.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND INSUFFICIENCY OF PROCESS** <br><br> Date: June 23, 2008 <br> Time: 10:00 a.m. <br>      Courtroom 7, 3rd Floor <br>      Hon. Thomas J. Whelan |
| SONY COMPUTER ENTERTAINMENT AMERICA, INC., <br><br> Counter-Complainant, <br><br> v. <br><br> BUZZTIME ENTERTAINMENT, INC. and NTN BUZZTIME, INC., <br><br> Counter-Defendants. | |

Case No. 08 CV 0122 W LSP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**Page(s)**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................... 2

III.    ARGUMENT ....................................................................................................... 4

    A.  The Jurisdictional Standard............................................................................... 4

        1. The Effects Test ........................................................................................... 7

            (i)-(ii)   SCEE, by Virtue of its Licensing of the BUZZ! Mark to SCEA for Use in
                      California, Purposefully Directed its Activity to California Such That it is
                      Amenable to Personal Jurisdiction Here. ................................................. 8

            (iii)     SCEE's Conduct Caused Harm to Buzztime, and SCEE Knew, or Should
                      Have Known, That Such Harm Would be Suffered in the Forum State ............... 11

        2. Buzztime's Claims Arise Out of SCEE's Forum-Related Activities................................. 13

        3. California Jurisdiction is Reasonable................................................................ 14

            (i)       Purposeful Interjection ............................................................... 14

            (ii)      Burden on the Defendant ................................................................ 15

            (iii)     Conflicts with Law and Sovereignty of Foreign State .................................. 15

            (iv)      Forum State's Interest in Adjudicating the Dispute .................................. 16

            (v)       Efficiency of the Forum ................................................................ 16

            (vi)      Convenient and Effective Relief for the Plaintiff .................................... 17

            (vii)     Existence of an Alternative Forum .................................................... 17

    B.  SCEE Is A Necessary Party To This Case ........................................................ 17

    C.  Service On SCEE Was Proper ....................................................................... 19

IV.     CONCLUSION .................................................................................................. 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

*Aanestad v. Beech Aircraft Corp.*,
  521 F.2d 1298 (9th Cir. 1974).................................................................. 4

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*,
  480 U.S. 102 (1987) ................................................................................ 9

*Ballard v. Savage*,
  65 F.3d 1495 (9th Cir. 1995).............................................................. 4, 14

*Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*,
  289 F.3d 589 (9th Cir. 2002) .............................................................. 8, 10

*Bockmeyer v. May*,
  383 F.3d 798 (9th Cir. 2004) ................................................................ 21

*Burger King v. Rudzewicz*,
  471 U.S. 462 (1985) ...................................................................... 5, 14, 16

*Cable Vision, Inc. v. KUTV, Inc.*,
  335 F.2d 348 (9th Cir. 1964) ................................................................ 17

*Calder v. Jones*,
  465 U.S. 783 (1984) .................................................................... 6, 7, 14

*Caruth v. International Psychoanalytic Associate*,
  59 F.3d 126 (9th Cir. 1995) ............................................................ 15, 16

*Core-Vent Corp. v. Nobel Industrial*,
  11 F.3d 1482 (9th Cir. 1993) ................................................ 6, 11, 14, 15

*Corporate Investment Business Brokers v. Melcher*,
  824 F.2d 786 (9th Cir. 1987) ................................................................ 17

*Dole Food Co., Inc. v. Watts*,
  303 F.3d 1104 (9th Cir. 2002) .............................................................. 16

*Emery v. Wood Industrial, Inc.*,
  No. 98-480-M, 2001 U.S. Dist. LEXIS 1016 (D.N.H. Jan. 17 2001) .............................. 21

*Gordy v. Daily News*,
  95 F.3d 829 (9th Cir. 1996) ................................................................ 16

*Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*,
  784 F.2d 1392 (9th Cir. 1986).................................................... 5, 6, 14

*Hanson v. Denckla*,
  357 U.S. 235 (1958) .............................................................................. 5

1
2     *International Star Class Yacht Racing Association v. Tommy Hilfiger, U.S.A., Inc.,*
          80 F.3d 749 (2nd Cir. 1996)................................................................. 11

3     *International Shoe Co. v. State of Washington,*
          326 U.S. 310 (1945).......................................................................... 5
4
5     *JTG of Nashville, Inc. v. Rhythm Band, Inc.,*
          693 F. Supp. 623 (M.D. Tenn. 1988) ................................................ 18

6     *Koehler v. Dodwell,*
          152 F.3d 304 (4th Cir. 1998) ........................................................... 20
7
8     *Massa v. Jiffy Products Co.,*
          240 F.2d 702 (9th Cir. 1957)............................................................ 17

9     *Mattel, Inc. v. MCA Records, Inc.,*
          28 F. Supp. 2d 1120 (C.D. Cal. 1998) ....................................... 8, 9, 10
10
11    *Miller v. Glenn Miller Productions,*
          318 F. Supp. 2d 923 (C.D. Cal. 2004)............................................... 10

12    *Nissan Motor Co., Ltd. v. Nissan Computer Corp.,*
          89 F. Supp. 2d 1154 (CD. Cal. 2000) ......................................... 6, 7, 11
13
14    *Ochoa v. J.B. Martin & Sons Farms,*
          287 F.3d 1182 (9th Cir. 2001)........................................................ 4, 6

15    *Perkins v. Benguet Consolidated Mining Co.,*
          342 U.S. 437 (1952) .......................................................................... 5
16
17    *Piper Aircraft Co. v. Reyno,*
          454 U.S. 235 (1981) ........................................................................ 17

18    *Prewitt Enterprise, Inc. v. Organization of Petroleum Exporting Countries,*
          353 F.3d 916 (11th Cir. 2003)........................................................ 21
19
20    *Roth v. Garcia Marquez,*
          942 F.2d 617 (9th Cir. 1991) .......................................................... 14

21    *Schwarzenegger v. Fred Martin Motor Co.,*
          374 F.3d 797 (9th Cir. 2004)............................................................ 7
22
23    *Sinatra v. National Enquirer,*
          854 F.2d 1191 (9th Cir. 1988).......................................................... 14

24    *Systems Designs, Inc. v. New Customware Co., Inc.,*
          248 F. Supp. 2d 1093 (D.Utah 2003) ............................................... 12
25
26    *Tax Lease Underwriters, Inc. v. Blackwall Green, Ltd.,*
          106 F.R.D. 595 (E.D. Mo. 1985) ..................................................... 20

27    *Toeppen v. Panavision,*
          141 F.3d 1316 (9th Cir. 1998)..................... 6, 7, 8, 11, 13, 14, 15, 16, 17
28

*In re Wella A.G.*,
    787 F.2d 1549 (Fed. Cir. 1986) ........................................................................... 10

*Williams v. Canon, Inc.*,
    432 F. Supp. 376 (C.D. Cal. 1977) ..................................................................... 10

## STATE CASES

*Veritas Operating Corp. v. Microsoft Corp.*,
    2008 WL. 495658 (W.D. Wash. 2008) ............................................................... 13

## FEDERAL STATUTES

15 U.S.C. § 1072 ................................................................................................... 12

15 U.S.C. § 1111 ................................................................................................... 12

Lanham Act § 5, 15 U.S.C.A. § 1055 .................................................................... 9

Fed. R. Civ. Proc. 19(a)(1) ............................................................................ 2, 17

Fed. R. Civ. P. 4(k)(l)(A) ..................................................................................... 4

Fed. R. Civ. P. 4(h)(2) ........................................................................................ 20

Fed. R. Civ. P. 4(f)(1) ......................................................................................... 20

Fed. R. Civ. P. 4(f)(2)(A) .................................................................................... 20

1      Plaintiffs Buzztime Entertainment, Inc. and NTN Buzztime, Inc. (collectively,

2  "Plaintiffs" or "Buzztime") respectfully submit the following Memorandum of Points and

3  Authorities in Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction and

4  Insufficiency of Process filed by Defendant Sony Computer Entertainment Europe, Ltd.

5  ("Defendant" or "SCEE"). This Memorandum is filed concurrently with the Declarations

6  of Andrew Abrams and Michael D. Tauber.

7  **I.     INTRODUCTION**

8      SCEE contends in its Motion that it should be entirely divorced from these

9  proceedings, as it does not "sell to consumers in the United States," nor "make, sell, offer

10  for sale or solicit business in California." Motion, p.7:9-10. Yet, SCEE declares under

11  penalty of perjury to the U.S. Patent and Trademark Office ("USPTO") that it has used the

12  BUZZ! mark in commerce in the United States. (Declaration of Andrew M. Abrams in

13  support of Plaintiffs' Opposition to the Motion to Dismiss for Lack of Personal Jurisdiction

14  and Insufficiency of Process filed by Defendant (hereinafter "Abrams Decl.", ¶ 2, Exhibit

15  1.) As evidence of its use of the BUZZ! mark in connection with interactive video and

16  computer games, SCEE submitted to the USPTO digital photographs of goods which are

17  *sold in the State of California.* (Abrams Decl., ¶ 3, Exhibit 2.) Apparently, when it is

18  convenient for the purposes of facilitating the registration of its marks, and thus availing

19  itself of the protections of U.S. trademark laws, SCEE is comfortable swearing that it has

20  used its BUZZ! mark in interstate commerce. However, when it does not wish to be haled

21  into court for trademark infringement, SCEE disavows any connection whatsoever with the

22  United States and the State of California. SCEE cannot have it both ways.

23      Given these contradictions, SCEE's arguments appear to be, at best, misguided, and

24  at worst, simply disingenuous. As SCEE's conduct substantially impacts Buzztime and

25  consumers in this jurisdiction, SCEE has "purposely availed itself" of the benefits and

26  protection of this forum's laws. Thus, the exercise of jurisdiction over SCEE by this Court

27  is proper.

28

1       Additionally, pursuant to Fed. R. Civ. Proc. 19(a)(1), SCEE is a necessary party to

2  this litigation as the owner of the trademarks at issue.  Because the Court cannot accord

3  complete relief to Buzztime in SCEE's absence, the exercise of jurisdiction against SCEE

4  is not only proper, but necessary in order to ensure the efficient use of judicial resources

5  and to accord Buzztime complete relief.

6       Finally, Buzztime asserts that service on SCEE was proper, as personal service is

7  expressly permitted under the Hague Convention and under Federal Rule of Civil

8  Procedure 4(f)(1) and (f)(2)(A).  For these reasons, Buzztime respectfully requests that this

9  Court deny SCEE's motion in its entirety.

10  **II.     STATEMENT OF FACTS**

11       Since their introduction in 1985, Buzztime's video games have become extremely

12  popular and widely recognized.  Buzztime's trivia game shows, quizzes, trivia content and

13  related competitions as well as multiplayer card games, and Play-Along Sports™ games

14  have been played by millions of loyal players at home and in restaurants and sports bars

15  via the Buzztime Network, which is viewed by the players on television screens.

16  (Declaration of Michael D. Tauber in support of Plaintiffs' Opposition to the Motion to

17  Dismiss for Lack of Personal Jurisdiction and Insufficiency of Process filed by Defendant

18  (hereinafter "Buzztime Decl."), ¶ 2.)  Buzztime owns one of the world's largest databases

19  of game show trivia, which includes questions, answers, clues and fun facts.  (Buzztime

20  Decl., ¶ 3.)  Buzztime estimates that its games are played by over 13 million people each

21  year.  (Buzztime Decl., ¶ 4.)

22       Additionally, Buzztime offers its games to subscribers via satellite and cable

23  television and over the Internet.  It also sells a home television game console version,

24  including accessories such as additional wireless game controllers and trivia content

25  cartridges, and hand-held versions of the BUZZTIME trivia video game in retail stores and

26  via the Internet.  (Buzztime Decl., ¶ 5.)

27       Buzztime is the owner of a family of trademarks containing the word "BUZZ" that

28

1    is used in connection with these interactive games.  For example, BUZZTIME owns the

2    following United States trademark registrations: Reg. No. 3,294,791 for BUZZTIME; Reg.

3    No. 2,460,367 for BUZZTIME; Reg. No. 2,908,923 for BUZZKIDS; Reg. No. 2,961,762

4    for BUZZHEAD; Reg. No. 2,583,460 for SHARE THE BUZZ; Reg. No. 3,316,718 for

5    BUZZTIME PLAY ALONG TV; and Reg. No. 3,424,104 for BUZZPOINTS.  (Buzztime

6    Decl., ¶ 6.)  (Collectively, the foregoing marks shall be referred to herein as the "Buzztime

7    Marks.")

8        "Buzztime" has been used in various forms as part of the company's trade name

9    since at least as early as 1999.  (Buzztime Decl., ¶ 7.)  Buzztime's rights in the

10   BUZZTIME trademark for use in connection with interactive video games and related

11   goods and services date back to at least as early as February, 2000.  (Buzztime Decl., ¶ 8.)

12   Buzztime has spent considerable time, money and effort over the years promoting its trade

13   name, its BUZZTIME mark and its family of "BUZZ" trademarks and developing

14   customer recognition and goodwill in its trademarks.  (Buzztime Decl., ¶ 9.)

15       At least five years after Buzztime's first commercial use of its trade name, SCEE

16   filed three intent-to-use applications with the USPTO for BUZZ and BUZZ! in connection

17   with various goods and services relating to interactive video and computer games.

18   (Abrams Decl., ¶ 4.)  Subsequently, on October 30, 2007, SCEA, on behalf of SCEE,

19   began to use the mark BUZZ! in U.S. commerce as the name of a trivia video game which

20   is promoted on the Internet through websites located at http://www.us.playstation.com/.

21   (Abrams Decl., ¶ 5.)  These trivia video games are available for purchase in this

22   jurisdiction from many large retailers, including: Walmart, Target, Best Buy, Circuit City,

23   Game Stop and EB Games.  (Abrams Decl., ¶ 6.)

24       On March 19, 2008, approximately two months after Buzztime filed this present

25   action, SCEE submitted a Statement of Use with the USPTO for its BUZZ! mark

26   (Application Serial No. 78/637,682).  In the Statement of Use, SCEE declared under

27   penalty of perjury: "Applicant is the owner of the mark sought to be registered, and is

28   using the mark in [United States] commerce on or in connection with [products relating to

3                                    Case No. 08 CV 0122 W LSP

1    interactive video and computer games].” (Abrams Decl., ¶ 2, Exhibit 1.)  As evidence of

2    this use, SCEE submitted digital photographs of the “BUZZ! Mega Quiz” video game and

3    accessory for the Sony PlayStation 2 game console. (Abrams Decl., ¶ 3, Exhibit 2.)  These

4    products are available for sale in this jurisdiction. *Id.*

5        On information and belief, SCEE has an express or implied license or other

6    agreement with Sony Computer Entertainment America, Inc. (“SCEA”) whereby SCEA’s

7    *actual* use of the BUZZ! marks in California (and elsewhere in the U.S.) inures to the

8    benefit of SCEE as the owner of such marks. (Abrams Decl., ¶ 7.)  Despite Buzztime’s

9    repeated written notifications of trademark infringement and the filing and service of this

10   Complaint, SCEA has, on behalf of SCEE, continued the sale and promotion of the BUZZ!

11   products in the United States and in this jurisdiction. (Abrams Decl., ¶ 8.)

12   **III.   ARGUMENT**

13       **A.    The Jurisdictional Standard**

14       When a district court acts on a defendant’s motion to dismiss under Rule 12(b)(2)

15   without holding an evidentiary hearing, the plaintiff need make only a *prima facie* showing

16   of jurisdictional facts to withstand the motion to dismiss.  Thus, the plaintiff need only

17   demonstrate facts that, if true, would support jurisdiction over the defendant. *Ballard v.*

18   *Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  For purposes of a Motion to Dismiss,

19   uncontroverted allegations in a plaintiff’s complaint must be taken as true, any evidentiary

20   materials submitted on the motion must be construed in the light most favorable to the

21   plaintiff, and all doubts must be resolved in its favor. *Ochoa v. J.B. Martin & Sons Farms*,

22   287 F.3d 1182, 1187 (9th Cir. 2001) (citation and internal quotation marks omitted).

23       For this Court to have jurisdiction over SCEE, the exercise must be authorized

24   under California’s “long-arm” statute and comport with constitutional due process.

25   *Aanestad v. Beech Aircraft Corp.*, 521 F.2d 1298, 1300 (9th Cir. 1974)); Fed. R. Civ. P.

26   4(k)(l)(A).  Since California’s long-arm statute extends jurisdiction to the very limits of

27   constitutional due process (pursuant to Cal. Code Civ. Proc. § 410.10), the Court need only

28

1    determine that its exercise of jurisdiction comports with due process. *Haisten v. Grass*

2    *Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1396 (9th Cir. 1986).

3         Due process merely requires that a non-resident defendant have "certain minimum

4    contacts with the forum such that the maintenance of the suit does not offend 'traditional

5    notions of fair play and substantial justice.'" *Intl. Shoe Co. v. State of Washington*, 326

6    U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945). Where a defendant deliberately engages

7    in significant activities within a state, purposely availing itself of the privilege of

8    conducting business there, it is presumptively reasonable to require defendant to "submit to

9    the burdens of litigation in that forum as well." *Burger King v. Rudzewicz*, 471 U.S. 462,

10    475-76, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). In such instances, "defendant's conduct

11    and connection with the forum State are such that he should reasonably anticipate being

12    haled into court there." *Id.* at 474 (*citing World-Wide Volkswagen Corp. v. Woodson*, 444

13    U.S. 286, 295, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)).

14         Applying the "minimum contacts" analysis, a court may obtain either general or

15    specific jurisdiction over a defendant. If the defendant's activities in the forum are

16    substantial, continuous and systematic, general jurisdiction is available, subjecting the non-

17    resident defendant to suit even on matters unrelated to his or her contacts to the forum.

18    *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 446, 96 L. Ed. 485, 72 S. Ct.

19    413 (1952). Specific jurisdiction may be exercised over a non-resident defendant if his or

20    her less substantial contacts with the forum give rise to the cause of action before the court.

21    The question is whether the cause of action arises out of or has a substantial connection

22    with that activity. *Hanson v. Denckla*, 357 U.S. 235, 250-53, 2 L. Ed. 2d 1283, 78 S. Ct.

23    1228 (1958).

24         In the Ninth Circuit, a finding of specific jurisdiction requires a showing that:

25       **1)  the nonresident defendant must do some act or consummate some transaction
     with the forum state or perform some act by which it purposefully avails itself**

26           **of the privilege of conducting activities in the forum state, thereby invoking
     the benefits and protections of its laws;**

27

28       **2)  the claim must arise out of or result from the defendant's forum-related
     activity; and**

1   **3)   the exercise of jurisdiction must be reasonable.**

2   *Ochoa, supra*, 287 F.3d at 1188-89 and n. 2.   Jurisdiction may be established with a lesser

3   showing of minimum contacts "if considerations of reasonableness dictate." *Haisten,*

4   *supra*, 784 F.2d at 1397.

5        "Purposeful availment" may be demonstrated where the *effects* of a defendant's

6   conduct are felt in the forum state.   *Calder v. Jones,* 465 U.S. 783, 79 L. Ed. 2d 804, 104 S.

7   Ct. 1482 (1984) (establishing the "effects test" for personal jurisdiction"); *Toeppen v.*

8   *Panavision,* 141 F.3d 1316, 1322 (9th Cir. 1998) ("under the 'effects test', the purposeful

9   availment requirement ... is satisfied.").   In *Calder*, the Supreme Court held that a

10  California court properly exercised personal jurisdiction over two Florida authors of an

11  allegedly libelous tabloid article that impugned the reputation of a California actress.

12  *Calder, supra*, 465 U.S. at 788.   The Court first focused on the fact that the harm from the

13  article would be principally suffered in California, where plaintiff lived and worked, and

14  second, that defendants were aware of this fact.   Thus, the Court held that the defendants

15  could "reasonably anticipate being haled into court [in California] based on the *effects* in

16  California of their Florida conduct." *Id.* at 789-90 (emphasis added).

17       Thus, under the Ninth Circuit's application of the 'effects test,' jurisdiction is

18  proper when there are: **i) intentional acts; ii) expressly aimed at a forum state; iii)**

19  **which cause harm, the brunt of which is suffered in the forum state.**   *Core- Vent Corp.*

20  *v. Nobel Indus.,* 11 F.3d 1482, 1486 (9th Cir. 1993); *Toeppen, supra,* 141 F.3d at 1321.   In

21  *Toeppen,* a trademark infringement case such as this one, the Ninth Circuit found personal

22  jurisdiction over an Illinois defendant who had registered plaintiffs trademarks as World

23  Wide Web domain names (e.g. Panavision.com) and then offered to sell the domain name

24  rights back to the plaintiff.   The court found that jurisdiction in California was proper,

25  reasoning that plaintiff suffered the brunt of the harm from infringement in California, its

26  principal place of business. *Toeppen, supra,* 141 F.3d at 1321; *see also Nissan Motor Co.,*

27  *Ltd. v. Nissan Computer Corp.*, 89 F. Supp. 2d 1154, 1160 (CD. Cal. 2000) ("brunt of the

28  harm suffered in the forum state because [plaintiff] is based in Gardena, California.")   The

1    *Toeppen* court also found defendant had directed his activity towards California because

2    "he knew" his extortion scheme would injure plaintiff in California. *Toeppen, supra,* 141

3    F.3d at 1322. Similarly, in *Nissan*, also a trademark infringement case, the court found

4    that a North Carolina defendant deliberately directed his activity towards California

5    because its website was changed to be confusingly similar to the plaintiff's trademark.

6    *Nissan, supra,* 89 F. Supp. 2d at 1160. Jurisdiction was proper where the defendant

7    knowingly acted towards California, and where the harm was suffered in California.

8        Defendant cites *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th

9    Cir. 2004) for the proposition that happenstance "effects" that are not an "external

10    manifestation of the actor's will" are not sufficient to establish jurisdiction. This case is

11    inapposite here, as it involves an alleged infringement of the right of publicity which was

12    solely directed at consumers in a different state, and the conduct took place entirely in that

13    state. The defendant's creation and publication of the advertisement bearing the plaintiff's

14    likeness was expressly aimed at Ohio rather than California, and the sole purpose of the

15    advertisement was to entice Ohioans to buy or lease cars from the defendant in Ohio. The

16    advertisement was never circulated in California, and the defendant had no reason to

17    believe that any Californians would see it and pay a visit to the dealership.

18        The situation here is far more analogous to the fact patterns in *Toeppen* and *Nissan*.

19    Jurisdiction is proper because SCEA has, on behalf of SCEE, marketed and sold infringing

20    products in the State of California, aimed at California residents. SCEE, through the

21    actions of SCEA, has directed its commercial activities towards California, and such

22    actions have resulted in considerable harm to Buzztime and the residents of this State.

23        **1.    The Effects Test**

24        The first factor of the Ninth Circuit's three-part jurisdictional test is known as the

25    "effects test," which establishes "purposeful availment" where the effects of a defendant's

26    conduct are felt in the forum state. *Calder* 465 U.S. 783. The test is satisfied by a showing

27    that the defendant committed i) intentional acts; ii) expressly aimed at a forum state; iii)

28

1    which cause harm, the brunt of which is suffered in the forum state. *Toeppen, supra*, 141

2    F.3d at 1321.

3                   (i)-(ii)  SCEE, by Virtue of its Licensing of the BUZZ! Mark to

                             SCEA for Use in California, Purposefully Directed its

4                                 Activity to California Such That it is Amenable to Personal

                             Jurisdiction Here.

5

6         In *Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120, 1127 (C.D. Cal. 1998)

7    *aff'd.* 296 F.3d 894 (9th Cir. 2002), *cert. denied*, 537 U.S. 1171 (2003), the court found

8    "purposeful availment" and held that foreign defendants were subject to jurisdiction in

9    California despite having no offices, employees, property, or agents in the forum, where a

10    coordinated plan existed among of all of the defendants to distribute the disputed Barbie

11    Girl song in the United States.  The court found an "intentional act" by the foreign

12    defendants for the purposes of the "effects test" where the defendants did more than merely

13    have their music product end up in California by happenstance.  Rather, there were cross-

14    licensing agreements between the foreign and U.S. members of the multi-national record

15    company that contemplated the distribution of the allegedly infringing song in California.

16    Furthermore, the foreign entities sent artwork and albums to their affiliates in the United

17    States for promotional purposes, and stood to profit from the album's royalties. *Id.*, at

18    1127-28.

19         As in *Mattel*, Buzztime alleges that the out-of-forum defendant has actively

20    engaged in a coordinated plan to distribute the infringing product in the United States.

21    Buzztime alleges that Defendant SCEE and its sister-corporation SCEA, *acting in concert*,

22    intentionally adopted the BUZZ! trademark for use in conjunction with a product virtually

23    identical to Buzztime's products, to call to mind the Buzztime Marks and thus wrongfully

24    trade on the extensive good will built in such marks.  Further, by the very nature of the

25    circumstances surrounding the use of the mark, SCEE *necessarily* granted SCEA a license,

26    either express or implied, to sell video games and accessories bearing its BUZZ! trademark

27    nationwide and in California. *See Barcamerica Intern. USA Trust v. Tyfield Importers,*

28    *Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) (A trademark licensor must supervise the use of the

1   mark or risk losing that mark.)

2        Buzztime reaches this conclusion based on the following evidence: as set forth in

3   the Statement of Facts, SCEE submitted a Statement of Use with the USPTO for its

4   BUZZ! mark (Application Serial No. 78/637,682), asserting that it is currently using the

5   mark in United States commerce. (Abrams Decl., ¶ 2, Exhibit 1.)  As proof of this use,

6   SCEE submitted digital photographs of the "BUZZ! Mega Quiz" video game and

7   accessory for the Sony PlayStation 2 game console, which are sold in this very jurisdiction.

8   (Abrams Decl., ¶ 3, Exhibit 2.)  Thus, SCEE treats SCEA's commercial trademark use as

9   *inuring to the benefit of SCEE* for registration purposes.  *See* Lanham Act § 5, 15 U.S.C.A.

10  § 1055 ("Where a registered mark or a mark sought to be registered is or may be used

11  legitimately by related companies, such use shall inure to the benefit of the registrant or

12  applicant for registration.")  For the purposes of facilitating the registration of its marks,

13  and thus availing itself of the protections of U.S. trademark laws, SCEE has declared that it

14  is using the infringing BUZZ! marks in interstate commerce.[1]  The fact that it is a licensee,

15  SCEA, that actually uses the BUZZ! mark in this forum is a mere technicality, and SCEE

16  cannot hide behind this concocted barrier to escape jurisdiction.  *See Mattel, supra,* 28

17  F.Supp.2d at 1127-28 (asserting jurisdiction against foreign defendants who entered into

18  cross-licenses with their U.S. counterparts.)

19       Notably, SCEE's declaration does not discuss a trademark license with SCEA, nor

20  whether SCEE obtains any revenue from the sales of BUZZ! products in the United States.

21  Nor does the declaration deny that SCEE has sent promotional or sample items to its

22  United States affiliate. (Abrams Decl., ¶ 10.)  Given that SCEE has painstakingly detailed

23  the contacts that SCEE *does not* have with the forum in its lengthy declaration, the logical

24  implication is that these pointed omissions are in fact true.  Thus, SCEE did not merely

25  passively place "its [trademark] into the stream of commerce."  *Asahi Metal Industry Co.,*

26  *Ltd. v. Superior Court of California*, 480 U.S. 102, 112 (1987)).  Rather, SCEE engaged in

---

27  [1] In fact, SCEE has filed several extensions of time to oppose U.S. marks before the Trademark Trial and
    Appeal Board ("TTAB") as part of its U.S. trademark enforcement efforts.  SCEE has also been the subject
28  of a TTAB proceeding brought against its U.S. marks.  (Abrams Decl., ¶ 9, Exhibit 3.)

Case No. 08 CV 0122 W LSP

1   a "coordinated plan" to have the offending products sold in this State. *See Mattel*, 28

2   F.Supp.2d at 1127-28 (finding purposeful availment where the foreign defendants entered

3   into license agreements with their U.S. counterparts, earned royalties, and sent promotional

4   items to the United States.)

5          SCEE relies on *Williams v. Canon, Inc.*, 432 F.Supp. 376 (C.D. Cal. 1977) for the

6   proposition that use of a trademark by a corporate subsidiary does not by itself subject a

7   parent company to jurisdiction.  However, the *Williams* case is inapplicable here, as the

8   underlying claim was for antitrust violations arising out of an employment dispute; the

9   lawsuit had nothing to do with the foreign licensor's trademark or its involvement in the

10  sale of infringing goods.  In contrast, this action is entirely about Defendants' use and

11  registration of the BUZZ! trademark in the United States, and in this forum in particular.

12  As emphasized previously, in order for SCEA to use SCEE's marks in California, some

13  form of implied or express license must be in place.  A trademark licensor *must* supervise

14  the use of the mark or risk losing that mark. *Barcamerica Intern., supra,* 289 F.3d at 596.

15  It cannot delegate that responsibility to another party or a sub-licensor. *E.g., Miller v.*

16  *Glenn Miller Productions*, 318 F.Supp.2d 923, 933 (C.D. Cal. 2004).  Thus, it follows that

17  SCEE, as the owner and licensor of the mark in question, had to know and intend that

18  goods bearing its mark would be sold in California.  Moreover, because SCEE must

19  engage in quality inspection and controls in order to maintain its trademark rights, it is fair

20  to conclude that SCEE actively participated in the wrongful conduct.  This is especially

21  true in view of the presumed royalty agreement and sending of materials to the U.S. entity,

22  discussed above.  As stated by Chief Judge Nies of the Federal Circuit, only the owner of a

23  trademark can apply for registration, and ownership is determined as follows: "[w]hether

24  the relationship is that of licensor/licensee or parent/subsidiary, *the one entity which*

25  *controls the nature and quality of the goods sold under the mark is the owner.*" *In re*

26  *Wella A.G.*, 787 F.2d 1549, 1554 (Fed. Cir. 1986) (emphasis added).

27         SCEE's attempts to convince the Court that it had no control over SCEA's use of

28  the BUZZ! trademark are reminiscent of two of the famous trio of monkeys who, by

                                        10              Case No. 08 CV 0122 W LSP

1   covering their eyes and ears, neither saw nor heard any evil. Willful ignorance should not

2   provide a means by which SCEE can evade its obligations under trademark law.

3   *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749,

4   753-54 (2nd Cir. 1996). In *Hilfiger*, the court rejected defendant's excuse that it had

5   innocently copied plaintiff's mark, as it had conducted limited trademark searching. *Id.*, at

6   754. The court chastised defendant by stating that given its awareness that it was copying

7   "authentic details ... from the sport of competitive sailing," it should have shown greater

8   concern for the possibility that it was infringing on another's mark. *Id.*, at 753. Similarly,

9   here, SCEE is part of a huge multi-national conglomerate that made over $78 Billion in

10   revenues for the fiscal year ended March 31, 2008. (Abrams Decl., ¶ 11.) It is a typical

11   practice for large corporations such as SCEE and its sister-companies to conduct extensive

12   trademark searching, and to engage in substantial marketing and consumer studies prior to

13   the launch of a new brand. (Abrams Decl., ¶ 12.) For SCEE to claim that it is blissfully

14   ignorant of all of SCEA's activities with respect to SCEE's marks in the State of California

15   is simply not credible.

16        In short, SCEE cannot claim ownership of the BUZZ! trademark and commercial

17   use before the USPTO, then turn around and allege the lack of any commercial presence

18   before this Court. It cannot have its cake and eat it too. Thus, the "intentional act" and

19   "expressly aimed at the forum state" prongs of the "effects test" are satisfied.

20           (iii)   <u>SCEE's Conduct Caused Harm to Buzztime, and</u>

21                 <u>SCEE Knew, or Should Have Known, That Such Harm</u>
                   <u>Would be Suffered in the Forum State</u>

22

23        The last element of the "effects test" asks whether the defendant's intentional

24   activities caused harm, the brunt of which is suffered, and which the defendant knows is

25   likely to be suffered, in the forum state. *Core-Vent, supra*, 11 F.3d at 1486. Under settled

26   law, Buzztime has suffered and continues to suffers economic harm in its home state of

27   California. *See Toeppen, supra*, 141 F.3d at 1322; *Nissan, supra*, 89 F. Supp. 2d at 1160

28   ("brunt of the harm suffered in the forum state because [plaintiff] is based in Gardena,

1   California.")  As Buzztime is based in San Diego, California, Buzztime has suffered the

2   brunt of the harm from SCEE's wrongful acts in this forum.

3         SCEE knew, or should have known, that Buzztime was likely to suffer harm in the

4   forum state due to its actions.  SCEE had ample constructive knowledge of Buzztime's

5   claim to ownership of the Buzztime Marks, its status as a California corporation and its

6   California location.  15 U.S.C. § 1072; *Systems Designs, Inc. v. New Customware Co.,*

7   *Inc.*, 248 F. Supp. 2d 1093, 1098 (D.Utah 2003) ("Trademarks are registered in a national

8   database, accessible to anyone.  By registering a trademark with this database, an owner of

9   a mark puts the world on notice - literally - that they have the rights to that mark.  Not only

10  does this establish a constructive notice as to the right to use the mark, it also establishes a

11  constructive notice as to where the mark is registered.").  Buzztime's marking of its

12  Buzztime Marks with a ® symbol constitutes statutory notice that the mark is a registered

13  trademark.  15 U.S.C. § 1111.  Even a modicum of diligence, such as a five-minute

14  trademark search on the USPTO's website, would have revealed Buzztime's identity and

15  California location.

16        Further, in light of the similarities between Defendants' BUZZ! branded interactive

17  video games and Buzztime's BUZZTIME branded interactive video games, it is highly

18  unlikely that SCEE conceived and designed its BUZZ! product without reference to

19  Buzztime's popular products.  This is especially true given the fact that SCEE's sister-

20  company, Sony Trans Com, a leading inflight entertainment (IFE) system and service

21  provider, announced in September 1997 an agreement with Plaintiffs' NTN Network to

22  supply trivia games for Sony Trans Com's enComp@ss program for inflight entertainment

23  services.  As a result of this agreement, the NTN Network agreed to provide Sony's

24  standard body airline customers with interactive, two-way, multi-player trivia games.

25  (Buzztime Decl., ¶ 10.)  SCEE's claimed first commercial use of its own BUZZ!

26  interactive trivia game was subsequent to this agreement, on October 30, 2007.  (Abrams

27  Decl., ¶ 5.)

28        Finally, having received correspondence from Buzztime (through its outside

                                    12                Case No. 08 CV 0122 W LSP

1    counsel), SCEE also had *actual* awareness of Buzztime, its products, its trademarks and its

2    California location.  The knowledge of SCEE's authorized representatives are imputed to

3    the organization as a matter of law.  *Veritas Operating Corp. v. Microsoft Corp.*, 2008 WL

4    495658, *68 (W.D. Wash. 2008) (under Ninth Circuit law, the knowledge of a party's

5    lawyers is imputed to the party.)

6          For these reasons, it is apparent that SCEE intentionally engaged in conduct that it

7    knew or reasonably should have known would affect Buzztime in California.  Accordingly,

8    the final prong of the "effects test" is established.

9          **2.      Buzztime's Claims Arise Out of SCEE's Forum-Related
                    Activities**

10

11         The second element of the Ninth Circuit's three-part jurisdictional test asks whether

12   the plaintiff's claims arise out of the defendant's forum related activities.  *Toeppen, supra,*

13   141 F.3d at 1322.  Thus, the Court must determine if Plaintiff would not have been injured

14   "but for" SCEE's wrongful conduct directed toward Buzztime in California.  *Id.*

15         Here, Buzztime alleges that SCEE intentionally adopted, applied for registrations

16   of, and licensed to SCEA, a confusingly similar name for its competing product in order to

17   improperly trade off the good will established in the Buzztime Marks.  As set forth in the

18   discussion pertaining to the "effects test," the presumption is that SCEE licensed its

19   BUZZ! marks to SCEA for use in California.  As part of this license, which supports

20   SCEE's Statement of Use with the USPTO, SCEE must necessarily exercise control over

21   SCEA's use of the mark in this forum.  Furthermore, the unrebutted presumption is that

22   SCEE obtains revenue from the sales of BUZZ! products in this forum and has sent

23   promotional or sample items to its United States affiliate.

24         Such conduct, and all of SCEE's actions described herein are likely to cause

25   confusion, deception and/or mistake as to the source or origin of Defendants' goods; and

26   whether Buzztime sponsors, endorses, or approves Defendants or their goods or is

27   otherwise affiliated with Defendants.  "But for" such conduct, Buzztime would not have

28   been injured.  Thus, Buzztime's claims arise out of SCEE's California-related activities

1    and the second jurisdictional factor is satisfied.

2              **3.**      **California Jurisdiction is Reasonable**

3          Under the third and final requirement for specific jurisdiction, the exercise of

4    jurisdiction must be "reasonable," that is, it must comport with "fair play and substantial

5    justice." *Toeppen, supra*, 141 F.3d at 1322; *Burger King, supra*, 471 U.S. at 476. It is

6    *SCEE*'s burden as the defendant to present a compelling case that the presence of some

7    other considerations would render jurisdiction unreasonable. *Core-Vent, supra*, 11 F.3d at

8    1487. An otherwise valid exercise of specific jurisdiction is presumed reasonable.

9    *Ballard, supra*, 65 F.3d at 1500.

10          Reasonableness is assessed by considering seven factors: (i) the extent of the

11    defendant's purposeful interjection; (ii) the burden of defending in the forum; (iii) the

12    extent of conflict with the sovereignty of the defendant's home state; (iv) the forum state's

13    interest in adjudicating the dispute; (v) the most efficient judicial resolution of the

14    controversy; (vi) the importance of the forum to the plaintiff's interests in convenient and

15    effective relief; and (vii) the existence of an alternative forum. *Core-Vent, supra*, 11 F.3d

16    at 1487-88. All seven of the factors must be balanced and none is dispositive in itself. *Id.*

17    at 1488. Because SCEE purposefully directed its activities at a California plaintiff, it is

18    SCEE's burden to "present a compelling case that the presence of some other

19    considerations would render jurisdiction unreasonable." *Toeppen*, 141 F.3d at 1322

20    (*quoting Core-Vent*, 11 F.3d at 1487).

21          Taken together, the seven factors weigh in favor of asserting jurisdiction:

22              (i)      Purposeful Interjection

23          The factor of purposeful interjection is satisfied by a finding of purposeful

24    availment, discussed *supra* in Section III(A)(1). *See Roth v. Garcia Marquez*, 942 F.2d

25    617, 623 (9th Cir. 1991); *Sinatra v. National Enquirer*, 854 F.2d 1191, 1199 (9th Cir.

26    1988); *Haisten supra*, 784 F.2d at 1401. As set forth previously, "purposeful availment" is

27    established where the effects of a defendant's conduct are felt in the forum state. *Calder*,

28

                                     14                    Case No. 08 CV 0122 W LSP

1   *supra*, 465 U.S. 783.  Here, SCEE, by presumptively licensing its BUZZ! marks to SCEA

2   for use in California, exercising quality controls over SCEA's use of the BUZZ! mark,

3   obtaining revenue from the sales of BUZZ! products in this forum, and sending

4   promotional or sample items to its United States affiliate, committed intentional acts that

5   were expressly aimed at the forum state.  Such acts continue to cause substantial harm to

6   Buzztime and consumers, the brunt of which is suffered in the forum state.  *See Toeppen,*

7   *supra*, 141 F.3d at 1321.  This factor thus favors Buzztime.

8                               (ii)    Burden on the Defendant

9          The second factor in determining whether jurisdiction is reasonable is the burden

10   on the defendant.  Here, the burden on SCEE is minimal.  SCEE is part of a huge multi-

11   national conglomerate that made over *$78 Billion* for the fiscal year ended March 31,

12   2008, and has more than ample resources to defend suit in California.  (Abrams Decl., ¶

13   11.)  Indeed, SCEE has a California sister-company and already has California counsel.

14   (Abrams Decl., ¶ 13.)  Moreover, in an age of instant communication such as e-mail and

15   video conferencing, the burden on SCEE of litigating in California is hardly unreasonable.

16   Accordingly, the burden of litigating in this forum is far from a "deprivation of due

17   process," which is the high standard SCEE is required to meet to "overcome [the] clear

18   justifications for the exercise of jurisdiction."  *Caruth v. Int'l Psychoanalytic Assoc*, 59

19   F.3d 126, 128-29 (9th Cir. 1995).

20                               (iii)   Conflicts with Law and Sovereignty of Foreign State

21          The third "reasonableness" factor concerns the extent to which the district court's

22   exercise of jurisdiction in California would conflict with the sovereignty of SCEE's home

23   jurisdiction.  *Core-Vent, supra*, 11 F.3d at 1489.  In this circumstance, the exercise of

24   jurisdiction by a federal court in California does not appear to implicate sovereignty

25   concerns where the foreign entity possesses ongoing business relationships with this

26   country and has clearly availed itself of the protections of the federal Lanham Act in

27   registering and using a trademark in the United States.  *Caruth, supra*, 59 F.3d at 129 ("In

28

1  determining how much weight to give this factor, we look to the presence or absence of

2  connections to the United States generally…The presence of an affiliate, subsidiary, or

3  agent is a significant consideration in evaluating sovereignty concerns.")

4        With respect to this factor, SCEE has certainly not presented a "compelling case

5  that the presence of some other considerations would render jurisdiction unreasonable in

6  order to defeat personal jurisdiction." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1114

7  (9th Cir. 2002), *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).  As

8  set forth previously, due to the conspicuous omission of any mention of a license or

9  royalties in connection with SCEA's use of SCEE's marks, the presumption is that SCEE

10  is profiting from the infringing use in this forum.  In view of this, the establishment of

11  jurisdiction against SCEE here would be far from unreasonable.

12                    (iv)    Forum State's Interest in Adjudicating the Dispute

13        The fourth factor inquires as to the forum state's interest in adjudicating the dispute

14  locally, as opposed to having the dispute adjudicated elsewhere.  California has a strong

15  interest in providing effective judicial redress for its citizens, particularly where the claim

16  is one for tortious injury.  *See, e.g., Toeppen, supra*, 141 F.3d at 1323 (trademark

17  infringement); *Gordy v. Daily News*, 95 F.3d 829, 836 (9th Cir. 1996) (defamation).

18  Because the claims in this case implicate the tort of infringement of proprietary rights

19  owned by a California resident, the State's interest is considerable.

20                    (v)    Efficiency of the Forum

21        This factor focuses on the location of the evidence and witnesses.  *Caruth, supra*,

22  59 F.3d at 129.  It is no longer weighed heavily given the modern advances in

23  communication and transportation.  *Id.*  Here, all of Buzztime's employee-witnesses and

24  documents are located in California.  (Buzztime Decl., ¶ 11.)  While SCEE undoubtedly

25  has some witnesses and documents in Europe, it is also likely to have relevant witnesses

26  and documents in this State, given the extensive use of its trademarks here.  Moreover, this

27  Court is already immersed in this litigation and is thus best suited to adjudicate it.

28

(vi)    Convenient and Effective Relief for the Plaintiff

The sixth "reasonableness" factor asks the court to evaluate the convenience and effectiveness of relief for the plaintiff in this jurisdiction. In examining this factor, a plaintiff's chosen forum is entitled to great deference. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981). Buzztime has comparably little resources, while SCEE has enormous resources. (Abrams Decl, ¶ 14.) All of Buzztime's employee-witnesses, and all of its documents relevant to this litigation, are in California. (Buzztime Decl., ¶ 11.) Thus, litigating outside of California would be very burdensome for Buzztime, especially as the only likely alternative forum is in the United Kingdom. To split this case into two separate parts on opposite sides of the globe is not only impractical, but cost-prohibitive.

(vii)    Existence of an Alternative Forum

The final "reasonableness" factor inquires about the existence of an alternative forum. The mere existence of an alternative forum cannot satisfy SCEE's burden to present a compelling case that jurisdiction is unreasonable. *See, e.g., Toeppen, supra*, 141 F.3d at 1324. Although alternative forums are theoretically available (namely, in the U.K.), this factor is not significant because all other factors weigh in favor of jurisdiction. *See Corporate Inv. Business Brokers v. Melcher*, 824 F.2d 786, 791 (9th Cir. 1987).

In sum, SCEE has not made a "compelling case" that the otherwise appropriate exercise of jurisdiction is unreasonable in these circumstances. Thus, specific jurisdiction over SCEE is consistent with constitutional due process, and therefore proper.

**B.    SCEE Is A Necessary Party To This Case**

In a suit for trademark infringement, the owner of the trademark at issue is a necessary party to the action. Fed. R. Civ. Proc. 19(a)(1), 28 U.S.C.A.[2]; *see Massa v. Jiffy Products Co.*, 240 F.2d 702, 705 (9th Cir. 1957); *Cable Vision, Inc. v. KUTV, Inc.*, 335 F.2d 348 (9th Cir. 1964), *certiorari denied* 85 S.Ct. 700, 379 U.S. 989, 13 L.Ed.2d 609

---

[2] Fed.Rules Civ.Proc.Rule 19(a)(1), 28 U.S.C.A: "A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
(A) in that person's absence, the court cannot accord complete relief among existing parties…"

Case 3:08-cv-00122-W-LSP    Document 23    Filed 06/06/2008    Page 23 of 28

1  (copyright context); *JTG of Nashville, Inc. v. Rhythm Band, Inc.*, 693 F. Supp. 623, 626

2  (M.D. Tenn. 1988) (in § 43(a) infringement suit filed by the exclusive U.S. distributor, the

3  foreign manufacturer and trademark owner is a necessary party to the lawsuit and will be

4  served as a party defendant.)  Pursuant to Fed. R. Civ.Proc. 19(a)(1), SCEE is a necessary

5  party to this litigation because in SCEE's absence, the Court cannot accord complete relief

6  to Buzztime.

7         The remedy sought by Buzztime *necessarily* implicates SCEE.  In its Amended

8  Complaint, Buzztime seeks various injunctive and monetary remedies.  Among them is an

9  order from the Court that the Director of the USPTO order that Defendants are not entitled

10 to any trademark registrations for the BUZZ Marks and any word, words, phrases,

11 symbols, logos, or any combination of words or symbols that would create a likelihood of

12 confusion, mistake, and/or deception therewith, including, without limitation, Defendants'

13 Trademark Application Serial Numbers 78/625,529; 78/525,239; and 78/637,682.

14 (Abrams Decl., ¶ 15.)  These trademark applications are owned solely by SCEE.  (Abrams

15 Decl., ¶ 16.)  If SCEE is removed from this case, the Court would no longer be able to

16 order the abandonment or cancellation of SCEE's infringing marks, thereby permitting

17 SCEE to continue to irreparably harm Buzztime.  Accordingly, the exercise of jurisdiction

18 against SCEE is not only proper, but necessary in order to ensure fairness and to accord

19 Buzztime complete relief.

20         Furthermore, the public interest favors including trademark owners in the litigation

21 to promote efficient use of judicial resources.  *See JTG, supra* 693 F. Supp. at 627.

22 Subsequent litigation against SCEE in an alternative forum would require re-litigation of

23 issues raised between Buzztime and SCEA, and would require separate proceedings

24 concerning the nature and extent of relief in connection with each party.  Such a separation

25 of claims arising out of a common set of facts is plainly less efficient than having all of the

26 necessary parties present in this forum, and inconsistent with the general thrust of the

27 Federal Rules of Civil Procedure.  *Id.*

28

### C.    Service On SCEE Was Proper

Buzztime personally served SCEE via a private process server on April 4, 2008. This service was proper, as personal service is expressly permitted under the Hague Convention and under Federal Rule of Civil Procedure 4(f)(1) and (f)(2)(A).

Article 10(c)[3] of the Hague Convention provides that so long as the signatory country does not object, interested parties can serve judicial documents directly through "judicial officers, officials or other competent persons of the State of destination." Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters art. 5, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163. The United Kingdom explicitly provides that service through competent persons is permitted.[4]  *See* U.S. Dept. of State, Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, http://travel.state.gov/law/info/judicial/judicial_686.html (dated June 2, 2008) (listing the objections of the signatory countries, listing none for the United Kingdom); *see also* Hague Conference on Private International Law, United Kingdom—Central Authority and practical information, http://www.hcch.net/index_en.php?act=authorities.details&aid=278 (dated June 2, 2008) (setting forth clarifying letters by the United Kingdom on Article 10(b) and (c), noting that direct service through a competent individual is acceptable).

---

[3] Article 10 of the Hague Convention says:
Provided the State of destination does not object, the present Convention shall not interfere with –
a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

[4] In response to a letter regarding the United Kingdom's position on 10(c), the Foreign and Commonwealth Office to the Permanent Bureau stated in pertinent part:
Thank you for your letter of 31 July in which you ask for assistance in the interpretation of the declaration made by the United Kingdom on 17 November 1967 in relation to Article 10(c) of the Convention.
I am happy to confirm that our declaration does not preclude any person in another Contracting State who is interested in a judicial proceeding (including his lawyer) from effecting service in the United Kingdom "directly" through a competent person other than a judicial officer or official, e.g., a solicitor.
*See* Declarations of the United Kingdom on the Hague Convention, available at http://www.hcch.net/index_en.php?act=authorities.details&aid=278 (visited June 2, 2008).

1   Additionally, several federal courts have found personal service via a private process

2   server to be effective under Article 10(c) of the Hague Convention. *See, e.g., Tax Lease*

3   *Underwriters, Inc. v. Blackwall Green, Ltd.*, 106 F.R.D. 595, 596-97 (E.D. Mo. 1985)

4   (finding service made by solicitor in England effective under Article 10); Koehler v.

5   Dodwell, 152 F.3d 304 (4th Cir. 1998). The actions taken by Buzztime appropriately track

6   the foregoing guidelines. Buzztime is an "interested party," and David Kramer—the

7   process server hired by Buzztime—is a "compentent person[] of the State of destination."

8        Because the method of service chosen by Buzztime is permitted under the Hague

9   Convention, it is thus effective under Rule 4(h)(2) and 4(f)(1), or under 4(f)(2)(A). Rule

10  4(h)(2) states that a party may serve a corporation outside of the United States "in any

11  manner prescribed by Rule 4(f) for serving an individual, except personal delivery under

12  (f)(2)(C)(i)." Fed. R. Civ. P. 4(h)(2). The method of personal delivery utilized by

13  Buzztime is permitted under Rule 4(f)(1), which provides that a foreign corporation may

14  be served "by any internationally agreed means of service that is reasonably calculated to

15  give notice, such as those authorized by the Hague Convention." Fed. R. Civ. P. 4(f)(1).

16  As detailed above, personal service by an interested party, made through a competent

17  person of the United Kingdom is authorized by Article 10(c).

18        In the alternative, even if personal service is merely "allowed," rather than

19  "authorized" by the Hague Convention, service would still be effective under Rule

20  4(f)(2)(A), which provides: ". . . if an international agreement *allows* but does not specify

21  other means, [service is acceptable] by a method that is reasonably calculated to give

22  notice: (A) as prescribed by the foreign county's law for service in that country in an action

23  in its courts of general jurisdiction." Fed. R. Civ. P. 4(f)(2)(A) (emphasis added). The

24  Hague Convention authorizes or allows for personal delivery by private process server

25  under Article 10(c). Accordingly, service is proper under either 4(f)(1) or 4(f)(2)(A), and

26  by corollary, 4(h)(2).

27        According to the plain language of Rule 4(h)(2), personal delivery on a foreign

28  corporation is *only prohibited "under (f)(2)(C)(i)."* Fed. R. Civ. P. 4(h)(2) (emphasis

                                    20                    Case No. 08 CV 0122 W LSP

1  added).  Personal delivery can still be made under 4(f)(1) and (f)(2)(A)-(B).  In other

2  words, personal delivery is effective if "authorized" or "allowed" by international

3  agreement.  It is only prohibited in the absence of international agreement.  In the cases

4  cited by SCEE, there were no international agreements approving direct personal service.

5  None of the countries at issue were signatories of the Hague Convention on Service.  *See*

6  *Prewitt Enter., Inc. v. Org. of Petroleum Exporting Countries*, 353 F.3d 916, 922 n.22

7  (11th Cir. 2003); *Emery v. Wood Indus., Inc.*, No. 98-480-M, 2001 U.S. Dist. LEXIS 1016

8  at *4 (D.N.H. Jan. 17 2001).  Moreover, both cases addressed earlier versions of Rule

9  4(f)(2).  The current version of Rule 4(f)(2) now clearly envisions that methods of service

10  allowed by international agreement will be effective.  In the present case, personal delivery

11  is "authorized" or "allowed" under Article 10(c) of the Hague Convention.  Thus, the

12  prohibition in Rule 4(h)(2) against personal delivery under 4(f)(2)(C)(i) is inapplicable

13  here.

14      Ultimately, the intent of the service rules is to protect a party's due process rights

15  by giving it ample notice of a legal action brought against it.  SCEE clearly has had ample

16  notice of this complaint, as it received copies of the necessary documents by personal

17  delivery and by international *registered* mail pursuant to Article 10(a) of the Hague

18  Convention.  Although the Ninth Circuit has held that *ordinary* first class mail is

19  insufficient, it has not said that registered mail is similarly insufficient.  *See Bockmeyer v.*

20  *May*, 383 F.3d 798 (9th Cir. 2004).  Moreover, SCEE is represented by the same counsel

21  as SCEA—an entity that has appeared in this lawsuit.  The Court should not indulge

22  SCEE's attempts to further increase the costs of service and cause delay.

23  **IV.   CONCLUSION**

24      For all the foregoing reasons, Buzztime respectfully requests that this Court deny

25  SCEE's motion in its entirety.  In the alternative, if the Court determines that there is

26  insufficient evidence at this time to deny SCEE's motion, Buzztime requests that the Court

27  set an expedited discovery schedule in order to allow Buzztime to obtain further

28

1    information regarding SCEE's contacts with this forum.

2

3    DATED: June 6, 2008                    Respectfully submitted,

4                                          FISH & RICHARDSON P.C.

5

6                                          By: s/ Lisa M. Martens
7                                               Lisa M. Martens
                                                 Andrew M. Abrams
8
                                          Attorneys for Buzztime
9                                         BUZZTIME ENTERTAINMENT, INC. and
                                          NTN BUZZTIME, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 08 CV 0122 W LSP

## PROOF OF SERVICE

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with United States Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

On June 6, 2008, I caused a copy of the following document(s):

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO SONY COMPUTER ENTERTAINMENT EUROPE, LTD.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND INSUFFICIENCY OF PROCESS**

to be served on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope, and addressed as follows:

James G. Gilliland, Jr.                          Attorneys For Defendant
Timothy R. Cahn                                  SONY COMPUTER
Megan M. Chung                                   ENTERTAINMENT EUROPE LTD
TOWNSEND AND TOWNSEND AND
CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111
Telephone:  (415) 576-0200
Facsimile:  (415) 576-0300

| X | **MAIL:** | Such correspondence was deposited, postage fully paid, with the United States Postal Service on the same day in the ordinary course of business. |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury that the above is true and correct.  Executed on June 6, 2008, at San Diego, California.

s/Nicole C. Pino
Nicole C. Pino

10836742.4.doc

23

Case No. 08 CV 0122 W LSP